UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

            Plaintiff,

                                      Civil Action No. _____

   v.

TEXTRON INC. and WHITTAKER CORPORATION,

            Defendants.

## REMEDIAL DESIGN / REMEDIAL ACTION

## CONSENT DECREE

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION | 2 |
| III. | PARTIES BOUND | 3 |
| IV. | DEFINITIONS | 3 |
| V. | GENERAL PROVISIONS | 7 |
| VI. | PERFORMANCE OF THE WORK | 8 |
| VII. | REMEDY REVIEW | 10 |
| VIII. | PROPERTY REQUIREMENTS | 11 |
| IX. | FINANCIAL ASSURANCE | 14 |
| X. | PAYMENTS FOR WORK AND RESPONSE COSTS | 15 |
| XI. | TRUST FUND; ADDITIONAL PAYMENTS | 19 |
| XII. | INDEMNIFICATION AND INSURANCE | 23 |
| XIII. | FORCE MAJEURE | 24 |
| XIV. | DISPUTE RESOLUTION | 25 |
| XV. | STIPULATED PENALTIES | 27 |
| XVI. | COVENANTS BY PLAINTIFF | 30 |
| XVII. | COVENANTS BY SDs AND SFAs | 32 |
| XVIII. | EFFECT OF SETTLEMENT; CONTRIBUTION | 34 |
| XIX. | ACCESS TO INFORMATION | 36 |
| XX. | RETENTION OF RECORDS | 37 |
| XXI. | NOTICES AND SUBMISSIONS | 37 |
| XXII. | RETENTION OF JURISDICTION | 40 |
| XXIII. | APPENDICES | 40 |
| XXIV. | MODIFICATION | 41 |
| XXV. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 41 |
| XXVI. | SIGNATORIES/SERVICE | 41 |
| XXVII. | FINAL JUDGMENT | 42 |

# I.   BACKGROUND

A.     The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.     The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice ("DOJ") for response actions at the Nuclear Metals, Inc. Superfund Site in Concord, Massachusetts ("Site"), together with accrued interest; and (2) performance of response actions by the defendants at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.     In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the Commonwealth of Massachusetts (the "State" or "Commonwealth") on June 30, 2016, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial design and remedial action ("RD/RA") for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree ("CD").

D.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration on June 30, 2016, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustees to participate in the negotiation of this CD.

E.     The defendants that have entered into this CD ("Settling Defendants" or "SDs") do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment. The Settling Federal Agencies ("SFAs") do not admit any liability arising out of the transactions or occurrences alleged in any counterclaim asserted by SDs.

F.     Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on June 14, 2001, 66 Fed. Reg. 32235, 32241.

G.     In response to a release or a substantial threat of a release of hazardous substances at or from the Site, the SDs (with financing from the SFAs) commenced in 2003 a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430 and pursuant to an Administrative Order by Consent for Remedial Investigation/Feasibility Study, CERCLA 01-2003-0021 ("RI/FS AOC").

H.     In response to a release or a substantial threat of a release of hazardous substances at or from the Site, pursuant to an Administrative Settlement Agreement and Order on Consent for Non-Time Critical Removal Action, CERCLA 01-2011-004 ("Building NTCRA AOC"), the SDs (with financing from the SFAs) commenced in August, 2011 a non-time critical removal

action to demolish the buildings at the Site down to their slab foundation and place a temporary cap over the remaining slab foundation.

      I.      The SDs completed a Remedial Investigation Report in April 2014, and a Feasibility Study Report in November 2014.

      J.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on October 31, 2014, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the Office of Site Remediation and Restoration, EPA Region 1, based the selection of the response action.

      K.      The decision by EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision ("ROD"), executed on September 28, 2015, on which the Commonwealth has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

      L.      A portion of the remedy selected in the ROD is being performed as a non-time critical removal action for groundwater ("GW NTCRA") pursuant to an Administrative Settlement Agreement and Order on Consent for Non-Time Critical Removal Action for Groundwater, CERCLA 01-2015-0008 ("Settlement for GW NTCRA").

      M.      Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

      N.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SDs shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

      O.      The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith, and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

      NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

      1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs. Solely for the purposes of this CD and the underlying complaint, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.   PARTIES BOUND

2.     This CD is binding upon the United States, and upon SDs and their successors and assigns. Any change in ownership or corporate or other legal status of a SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's responsibilities under this CD.

3.     SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing any SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SDs within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.   DEFINITIONS

4.     Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls ("ICs") are needed to implement the Remedial Action, including, but not limited to, the following properties in Concord, Massachusetts: 2320 Main Street, 222B Main Street, 2250 Main Street, 2284 Main Street, 2194 Main Street, 35 Forest Ridge Road, 2229 Main Street; and the following properties in Acton, Massachusetts: 16 Knox Trail-28, 112 Powder Mill Street, and 284 High Street.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXIII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

3

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 12 (Emergencies and Releases), ¶ 13 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 29 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure access or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIV (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs SDs have agreed to pay under this CD that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from October 1, 2017 to the Effective Date, and Agency for Toxic Substances and Disease Registry costs regarding the Site.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices (including Notices of Activity and Use Limitation) that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between October 1, 2017 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"MassDEP" shall mean the Massachusetts Department of Environmental Protection and any successor departments or agencies of the Commonwealth.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than a SD, that owns or controls any Affected Property, including but not limited to, Starmet Corporation and Starmet NMI

4

Corporation. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Non-Time Critical Removal Action for Groundwater" or "GW NTCRA" shall mean the response actions authorized by the EPA Action Memorandum relating to the Site signed on September 28, 2015 by the Acting Director of the Office of Site Remediation and Restoration, EPA Region 1, and all attachments thereto.

"Notice of Activity and Use Limitation" or "NAUL" shall mean a notice of activity and use limitation as described in 310 CMR Sections 40.0111, 40.1070, and 40.1074 that provides property owners, holders of record property interests, and others with notice of the presence and location of contamination remaining at the property subject to the NAUL, and identifies activities and uses that are consistent or inconsistent with maintaining the remedy at the Site.

"Nuclear Metals Groundwater NTCRA Trust" or "GW NTCRA Trust Fund" shall mean the trust fund established pursuant to the Settlement for GW NTCRA.

"Nuclear Metals NTCRA Trust" or "Building NTCRA Trust Fund" shall mean the trust fund established pursuant to the Administrative Settlement Agreement and Order on Consent for Non-Time Critical Removal Action ("Building NTCRA AOC"), U.S. EPA Region 1 Docket Number CERCLA-01-2011-004.

"Nuclear Metals Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), and the RI/FS AOC.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SDs.

"Past Response Costs" shall mean all outstanding costs, including, but not limited to, direct and indirect costs, that the United States, on behalf of EPA, paid at or in connection with the Site through September 30, 2017, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiff" shall mean the United States.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on September 28, 2015 by the Director of the Office of Site Remediation and Restoration, EPA Region 1, and all attachments thereto. The ROD is attached as Appendix A.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA as stated in the SOW.

"RI/FS Oversight Costs" shall mean the costs on the February 26, 2018 itemized cost summary for the Nuclear Metals, Inc. Superfund Site covering the time period August 1, 2014 to September 2, 2016.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settlement for GW NTCRA" shall mean the Administrative Settlement Agreement and Order on Consent for Non-Time Critical Removal Action for Groundwater, U.S. EPA Region 1 Docket Number CERCLA-01-2015-0008.

"Settling Defendants" or "SDs" shall mean Textron Inc. and Whittaker Corporation.

"Settling Federal Agencies" or "SFAs" shall mean the United States Army and the United States Department of Energy and their successor departments, agencies, or instrumentalities.

"Site" shall mean the Nuclear Metals, Inc. Superfund Site, encompassing approximately 46 acres, located at 2229 Main Street in Concord, Middlesex County, MA and surrounding areas where groundwater contamination has come to be located. The Site is depicted generally on the map attached as Appendix C.

"State" shall mean the Commonwealth of Massachusetts.

"Statement of Work" or "SOW" shall mean the document describing the activities SDs must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as Appendix B.

"Supervising Contractor" shall mean the principal contractor retained by SDs to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA and the SFAs.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of

6

CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous material" under Section 2 of M.G.L. c. 21E.

"Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XX (Retention of Records).

## V.    GENERAL PROVISIONS

5.    **Objectives of the Parties.** The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SDs, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SDs and the claims of the SDs that have been or could have been asserted against the United States with regard to this Site as provided in this CD.

6.    **Commitments by SDs and SFAs.**

a.    SDs shall pay for and perform the Work in accordance with this CD, and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD. SFAs shall pay for the Work, and shall pay EPA for its response costs, as provided in this CD.

b.    SDs' obligations to pay for and perform the Work in accordance with this CD, including obligations to pay amounts due under this CD, are joint and several. In the event of the insolvency of any SD or the failure by any SD to implement any requirement of this CD, the remaining SD shall complete all such requirements.

7.    **Compliance with Applicable Law.** Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.    **Permits.**

a.    As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.    SDs may seek relief under the provisions of Section XIII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a. and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

7

c.     This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.    PERFORMANCE OF THE WORK

9.     **Coordination and Supervision.**

a.     **Project Coordinators.**

(1)     SDs' Project Coordinator must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinator may not be an attorney representing any SD in this matter. SDs' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)     EPA shall designate and notify the SDs of its Project Coordinator (also known as the remedial project manager) and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)     SDs' Project Coordinator shall meet with EPA's Project Coordinator at least monthly.

b.     **Supervising Contractor.** SDs' proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed.**

(1)     SDs shall designate, and notify EPA, within 10 days after the Effective Date, of the name(s), contact information, and qualifications of the SDs' proposed Project Coordinator and Supervising Contractor.

(2)     EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SDs shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SDs' selection.

8

(3)     SDs may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)     Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), SDs have proposed, and EPA has authorized SDs to proceed, regarding the following Project Coordinator and Supervising Contractor: Bruce Thompson, *de maximis, inc.*, 200 Day Hill Road, Suite 200, Windsor, CT 06095; *de maximis, inc.*, 450 Montbrook Lane, Knoxville, TN 37919.

10.     **Work Completion.**

a.     **Certification of Performance of RI/FS Responsibilities**. Upon payment of RI/FS Oversight Costs pursuant to ¶ 30.b. of this CD, SDs responsibilities under the RI/FS AOC shall be completely and successfully discharged pursuant to ¶ 83 of the RI/FS AOC.

b.     **Building NTCRA Notice of Completion of Work**. EPA has previously communicated to SDs in writing its determination, pursuant to ¶ 124 of the Building NTCRA AOC, that all Work (as defined in the Building NTCRA AOC) has been fully performed with the exception of any continuing obligations. Notwithstanding the foregoing, all of the continuing obligations enumerated in ¶ 124 of the Building NTCRA AOC shall be performed by SDs pursuant to this CD.

c.     **GW NTCRA Notice of Completion of Work.**

(1)     Five days after the Effective Date, SDs shall submit to EPA a detailed summary of any on-going tasks under the Removal Action Work Plan, O&M Plan or other deliverable under the Settlement for GW NTCRA that will be incorporated into the applicable deliverable under this CD, and serve as the Final Report for the GW NTCRA. In accordance with ¶ 1.6 of the SOW, such on-going tasks will be effective under the SOW until incorporated into a corresponding RD/RA deliverable.

(2)     Upon EPA's approval of the GW NTCRA Final Report required by ¶ 10.c(1) and issuance of a Notice of Completion of Work pursuant to ¶ 125 of the Settlement for GW NTCRA, all elements of the remedy selected in the ROD (including operation, maintenance, and monitoring of the *ex-situ* groundwater treatment system), and all of the continuing obligations enumerated in ¶ 125 of the Settlement for GW NTCRA shall be performed by SDs pursuant to this CD.

11.     **Performance of Work in Accordance with SOW.**

a.     SDs shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

12.     **Emergencies and Releases.** SDs shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XVI (Covenants by Plaintiff), nothing in this CD, including ¶ 4.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health

and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SDs' failure to take appropriate response action under ¶ 4.3 of the SOW, EPA takes such action instead, SDs shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

13.     **Community Involvement**. If requested by EPA, SDs shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator. Costs incurred by the United States under this Paragraph constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

14.     **Modification of SOW or Related Deliverables**.

a.      If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIV (Dispute Resolution).

b.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all work required by such modification. SDs shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

15.     Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

16.     **Periodic Review**. SDs shall conduct, in accordance with ¶ 4.7 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

17.     **EPA Selection of Further Response Actions**. If EPA determines, at any time, that the RA is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

18.     **Opportunity to Comment**. SDs and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to

comment on any further response actions proposed by EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

19.     **SDs' Obligation to Perform Further Response Actions**. If EPA selects further response actions relating to the Site, EPA may require SDs to perform such further response actions, but only to the extent that the reopener conditions in ¶¶ 77 or 78 (United States' Pre- and Post-Certification Reservations) are satisfied. SDs may invoke the procedures set forth in Section XIV (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of ¶¶ 77 or 78 are satisfied, (b) EPA's determination that the RA is not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes regarding EPA's determination that the RA is not protective or EPA's selection of further response actions shall be resolved pursuant to ¶ 60 (Record Review).

20.     **Submission of Plans**. If SDs are required to perform further response actions pursuant to ¶ 19, they shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work). SDs shall implement the approved plan in accordance with this CD.

# VIII.  PROPERTY REQUIREMENTS

21.     **Agreements Regarding Access and Non-Interference.**  SDs shall, with respect to any Non-Settling Owner's Affected Property where access is necessary to complete the Work, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner: (i) provide Plaintiff and SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity required by the CD, including those listed in ¶ 21.a. (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will: (x) pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or (y) interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action.  Potential restrictions for such Affected Property include those listed in ¶ 21.b. (Land, Water, or Other Resource Use Restrictions).

　　　　　a.     **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

　　　　　　　　　(1)     Monitoring the Work;

　　　　　　　　　(2)     Verifying any data or information submitted to the United States;

　　　　　　　　　(3)     Conducting investigations regarding contamination at or near the Site;

　　　　　　　　　(4)     Obtaining samples;

　　　　　　　　　(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

11

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 81 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XIX (Access to Information);

(9)     Assessing SDs' compliance with the CD;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

b.      **Land, Water, or Other Resource Use Restrictions**. The following is a list of land, water, or other resource use restrictions potentially applicable to the Affected Property:

(1)     Prohibiting or restricting excavation in areas of the Site where soil greater than 10 feet below ground surface exceeds Performance Standards;

(2)     Prohibiting pumping and consumption of contaminated groundwater;

(3)     Prohibiting disturbance of extraction wells and groundwater treatment system;

(4)     Preventing unacceptable exposure to, and disturbance of the Holding Basin area; and

(5)     Requiring installation of vapor mitigation systems should future structures be built above the volatile organic compound plumes unless an evaluation of vapor intrusion risks is performed to show such systems are not necessary.

22.     **Institutional Controls.**  In accordance with the procedures and schedule to be included in the Institutional Control Implementation and Assurance Plan ("ICIAP"), SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in executing and recording, amending, modifying, or terminating (a) Proprietary Controls in accordance with procedures to be included in the ICIAP that: (i) grant a right of access to conduct any activity regarding the CD, including those activities listed in ¶ 21.a.; and (ii) grant the right to enforce the land, water, or other resource use restrictions set forth in ¶ 21.b., or (b) Notices of Activity and Use Limitation ("NAULs") that provide notice of the land, water, or other resource use restrictions set forth in ¶ 21.b. The type of IC that the SDs shall obtain on each Non-Settling Owner's Affected Property shall be subject to EPA approval,

12

with a reasonable opportunity for review and comment by the State. The NAULs and IC Design Statements (an attachment to a NAUL that summarizes the site background and the required ICs) must be in substantially the form attached hereto as Appendix D.

23.    **Notices of Activity and Use Limitation (NAULs).**

a.    In accordance with the procedures and schedule to be included in the ICIAP, SDs shall submit final originals of each NAUL executed by the owner of the Affected Property and associated documentation for final approval and signature by EPA and the State.

b.    Within 45 days of receiving a fully-executed NAUL from EPA or the State, SDs shall record and/or register the NAUL in the appropriate land records office. However, if more than 6 months has elapsed between SDs submission of a draft NAUL and other documentation required in accordance with the ICIAP and EPA's final approval of the NAUL, SDs shall submit updated title evidence to EPA and submit draft notice letters to current holders of any record interest in accordance with 310 CMR 40.1074(1)(d) that were recorded after the date of the initial title evidence. SDs shall ensure that, at least 30 days prior to recording a NAUL, current holders of any record interest in the Affected Property are notified in accordance with 310 CMR 40.1074(1)(d).

c.    SDs shall, within 30 days after recording and/or registering each NAUL, or such other deadline approved by EPA, provide to EPA and the State certified copies of the recorded and/or registered NAUL showing filing information for the NAUL and any survey plans.

d.    SDs shall monitor and annually report on all NAULs required under this CD including whether such NAULs are incorporated by reference or in full in all deeds and any other instrument of transfer recorded after the date of such NAUL. In accordance with the procedures to be included in the ICIAP, SDs shall prepare, obtain approval of, and record any amendments, modifications, and/or terminations of any NAUL, including preparing surveys and plans.

24.    **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure Proprietary Controls, NAULs, agreements (including agreements regarding access and non-interference), releases, subordinations, modifications, or relocations of prior encumbrances that affect the title to the Affected Property, as applicable; provided, however, that SDs shall not be required to pay any money in consideration of such access (including securing Proprietary Controls) to any person that (i) is not a party to this CD whom EPA has identified as a potentially responsible party prior to the Effective Date, or (ii) had a presence at 2229 Main Street, Concord, MA prior to the Effective Date. If SDs are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify EPA, and include a description of the steps taken to comply with the requirements. If EPA deems it appropriate, it may assist SDs, or take independent action, in obtaining such Proprietary Controls, NAULs, agreements (including agreements regarding access and non-interference), releases, subordinations, modifications, or relocations of prior encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such

13

assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs). SDs shall make payment(s) of money, if any, in consideration of access or Institutional Controls using funds from the RD/RA Trust Fund, as defined in Section XI (Trust Fund; Additional Payments).

25.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SDs shall cooperate with EPA's efforts to secure and ensure compliance with such Institutional Controls.

26.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs shall continue to comply with their obligations under the CD, including their obligation to provide and/or secure access, to implement, monitor, and report on Institutional Controls, and to abide by such Institutional Controls. If SDs determine that the owner of any property for which a NAUL has been recorded or registered has not referenced the NAUL in an instrument of Transfer of the Affected Property, SDs shall notify EPA and the State. SDs shall also use best efforts to obtain the property owner's signature on an amended or confirmatory instrument of Transfer of the Affected Property, and record or register the amended or confirmatory instrument of Transfer of the Affected Property in the appropriate land records office.

27.     Notwithstanding any provision of the CD, Plaintiff retains all of its access authorities and rights, as well as all of its rights to require Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.     FINANCIAL ASSURANCE

28.     Following the approval of the RD/RA Trust, EPA's receipt of written confirmation from the trustee of the RD/RA Trust Fund that all payments required by Paragraphs 32.b. and 37 of this CD have been made shall satisfactorily demonstrate to EPA that the SDs have met the financial assurance requirements for the estimated costs of the Work to be performed by the SDs under this CD. Thereafter, until SDs' receipt of EPA's Certificate of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW, EPA's receipt of written confirmation from the trustee of the RD/RA Trust Fund that payments required by Paragraphs 37, 44 and 45 have been made shall satisfactorily demonstrate to EPA that SDs continue to meet the financial assurance requirement for the Work to be performed by SDs under this CD.

29.     **Access to Financial Assurance.**

a.     After commencement and for the duration of any Work Takeover under Paragraph 81, EPA shall have immediate access to and benefit of any money in the RD/RA Trust Fund in accordance with the provisions of Paragraph 7 of the RD/RA Trust Agreement.

b.     If at the commencement of a Work Takeover under Paragraph 81, the most recent Trustee's Report (as defined in ¶ 40) indicates that the estimated amount of money needed for SDs to complete the Work under this CD, including reimbursement of Future

Response Costs, is greater than the amount of money currently in the RD/RA Trust Fund, then EPA shall issue a written demand for an amount sufficient to cover the cost of the Work remaining to be performed (which amount shall be determined by subtracting the amount of money currently in the RD/RA Trust Fund from the amount of money needed for SDs to complete the Work under this CD, including reimbursement of Future Response Costs). SFAs shall have 10 days to review and comment on EPA's written demand. SDs shall, within 60 days of such demand, pay 2% of the amount demanded as directed by EPA. SFAs shall, as soon as reasonably practicable, pay 98% of the amount demanded as directed by EPA. In the event that the SFA payment is not made within 60 days after the date demanded, the United States, on behalf of SFAs, shall pay Interest on the unpaid balance, with such Interest commencing on the 61st day after the demand date and accruing through the date of the payment.

       c.      Any EPA Work Takeover costs not covered by the RD/RA Trust Fund or paid pursuant to Paragraph 29.b must be reimbursed by SFAs and SDs in the amount of 98% and 2% respectively as Future Response Costs under Section X (Payments for Response Costs).

## X.    PAYMENTS FOR WORK AND RESPONSE COSTS

30.     **Payments by SDs for United States Past Response Costs and RI/FS Costs**.

       a.      Within 30 days after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payments), SDs shall pay to EPA $7,959.58 in payment for Past Response Costs. Payment shall be made in accordance with ¶ 34.a. (instructions for past response cost payments).

       b.      Within 30 days after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payment), SDs shall pay to EPA $10,483.19 in payment for RI/FS Oversight Costs. Payment shall be made in accordance with ¶ 34.a (instructions for past response cost payments).

       c.      **Deposit of Past Response Costs and RI/FS Payments**. The total amounts to be paid by Setting Defendants pursuant to ¶ 30.a. and ¶ 30.b. shall be deposited by EPA in the Nuclear Metals Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

31.     **Payments by SDs for United States Future Response Costs**.

       a.      SDs shall pay to EPA from the RD/RA Trust Fund, as defined in Section XI (Trust Fund; Additional Payments) all Future Response Costs not inconsistent with the NCP.

       b.      **Periodic Bills**. On a periodic basis, EPA will send SDs a bill requiring payment that includes a Region 1 standard cost summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. SDs shall make all payments within 30 days after SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 35, in accordance with ¶ 34.b. (instructions for future response cost payments).

       c.      **Deposit of Future Response Costs Payments**. The total amount to be paid by SDs pursuant to ¶ 31.b. shall be deposited by EPA in the Nuclear Metals Special

Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Nuclear Metals Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum.

32. **Payments by SFAs.**

a. **Payment to EPA.**

(1) As soon as reasonably practicable after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payments), the United States, on behalf of SFAs, shall pay to EPA $390,019.62 in payment of Past Response Costs.

(2) As soon as reasonably practicable after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payments), the United States, on behalf of SFAs, shall pay to EPA $513,676.50 in payment of RI/FS Oversight Costs.

(3) The total amount to be paid on behalf of SFAs pursuant to this Paragraph shall be deposited by EPA in the Nuclear Metals Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

b. **Payments to RD/RA Trust Fund.**

(1) As soon as reasonably practicable after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payments), the United States, on behalf of SFAs, shall make an initial payment towards the estimated costs to perform the Work and reimbursement of EPA Future Response Costs of $49,000,000 to the RD/RA Trust Fund, in the form of a check or current EFT procedures to be provided to SFAs by EPA Region 1.

(2) Exactly one year after SFAs' initial payment described in Paragraph 32.b(1), the United States, on behalf of SFAs, shall make a second payment towards the estimated costs to perform the Work and reimbursement of EPA Future Response Costs of $52,715,696.46 to the RD/RA Trust Fund, in the form of a check or current EFT procedures to be provided to SFAs by EPA Region 1.

c. **Interest.** In the event that any payment required by ¶¶ 32.a. or 32.b(1) is not made within 90 days after EPA's approval of the RD/RA Trust Agreement, as defined in Section XI (Trust Fund; Additional Payments), the United States, on behalf of SFAs, shall pay Interest on the unpaid balance, with such Interest commencing on the 91st day after EPA's approval of the RD/RA Trust Agreement and accruing through the date of the payment. In the

16

event that the payment required by ¶ 32.b(2) is not made within 60 days after the one-year anniversary of the initial payment, the United States, on behalf of SFAs, shall pay Interest on the unpaid balance, with such Interest commencing on the 61st day after the one-year anniversary of the initial payment and accruing through the date of the payment.

   d.  The Parties to this CD recognize and acknowledge that the payment obligations of the SFAs under this CD can only be paid from appropriated funds legally available for such purpose. Nothing in this CD shall be interpreted or construed as a commitment or requirement that any SFA obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of law.

  33.  **Other Payments to RD/RA Trust Fund.**

   a.  After EPA's approval of the RD/RA Trust Agreement, any money remaining in the Building NTCRA Trust Fund that is attributable to contributions by SDs and SFAs shall be deposited in the RD/RA Trust Fund. Such deposit shall be accompanied by instructions specifying the identity of each party on whose behalf the deposit is made, and the amount of the deposit attributed to each party.

   b.  Upon EPA's issuance of a Notice of Completion of Work for the GW NTCRA and after EPA's approval of the RD/RA Trust Agreement, any money remaining in the GW NTCRA Trust Fund that is attributable to contributions by SDs and SFAs shall be deposited in the RD/RA Trust Fund pursuant to the Settlement for GW NTCRA. Such deposit shall be accompanied by instructions specifying the identity of each party on whose behalf the deposit is made, and the amount of the deposit attributed to each party.

  34.  **Payment Instructions for SDs.**

   a.  **Past Response Costs Payments.**

    (1)  The Financial Litigation Unit (FLU) of the United States Attorney's Office for the District of Massachusetts shall provide SDs, in accordance with ¶ 112, with instructions regarding making payments to DOJ on behalf of EPA. The instructions must include a Consolidated Debt Collection System ("CDCS") number to identify payments made under this CD.

    (2)  For all payments subject to this ¶ 34.a., SDs shall make such payment by Fedwire Electronic Funds Transfer (EFT) to the U.S. DOJ account, in accordance with the instructions provided under ¶ 34.a(1), and including references to the CDCS Number, Site/Spill ID Number 017D, and DJ Number 90-11-2-07237/12.

    (3)  For each payment made under this ¶ 34.a., SDs shall send notices, including references to the CDCS, Site/Spill ID, and DJ numbers, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 112.

   b.  **Future Response Costs Payments and Stipulated Penalties.**

    (1)  For all payments subject to this ¶ 34.b., SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33
33 Liberty Street
New York NY 10045
Field Tag 4200 of the Fedwire message should read
            "D 68010727 Environmental Protection Agency"

(2)     For all payments made under this ¶ 34.b., SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 34.b., SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 112. All notices must include references to the Site/Spill ID and DJ numbers.

35.     **Contesting Future Response Costs**. SDs may submit a Notice of Dispute, initiating the procedures of Section XIV (Dispute Resolution), regarding any Future Response Costs billed under ¶ 31 (Payments by SDs for United States Future Response Costs) if they determine that EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if they believe EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XXI (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If SDs submit a Notice of Dispute, SDs shall pay all uncontested Future Response Costs to the United States within 30 days after SDs' receipt of the bill requiring payment. Simultaneously, SDs shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SDs shall send to the United States, as provided in Section XXI (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SDs shall pay the sums due (with accrued interest) to the United States within 7 days after the resolution of the dispute. If SDs prevail concerning any aspect of the contested costs, SDs shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States within 7 days after the resolution of the dispute. SDs shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 34.b. (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for its Future Response Costs.

36.     **Interest**. In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, SDs shall pay

18

Interest on the unpaid balance. The Interest on Past Response Costs under this Paragraph shall begin to accrue on the Effective Date. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiff by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 64 (Stipulated Penalty Amounts – Work).

## XI.   TRUST FUND; ADDITIONAL PAYMENTS

37.     Within 30 days after the Effective Date, SDs shall submit to EPA for approval a fully-executed trust agreement (the "Remedial Design/Remedial Action Trust Agreement" or "RD/RA Trust Agreement") establishing the "Nuclear Metals Remedial Design/Remedial Action Trust" (hereafter, the "RD/RA Trust Fund"), in substantially the form attached hereto as Appendix E, and shall notify EPA of the identity and qualifications of the trustee. The RD/RA Trust Agreement shall confer upon the trustee powers and authorities required or sufficient to finance the obligations of SDs under this CD, including performance of the Work. EPA, after providing SFAs with an opportunity to comment, shall notify SDs, in writing, of its approval or disapproval of the proposed RD/RA Trust Agreement, any part thereof, or the proposed trustee. Within 14 days after any disapproval of the RD/RA Trust Agreement or the proposed trustee, SDs shall submit a revised RD/RA Trust Agreement to EPA or shall provide a notice of dispute pursuant to Section XIV (Dispute Resolution). Within 30 days after EPA's approval of the RD/RA Trust Agreement, or within 21 days after resolution of any dispute regarding the RD/RA Trust Agreement under which the RD/RA Trust Agreement is approved (hereafter this date is referred to as the "Approval of the RD/RA Trust"), SDs shall make an initial payment towards the estimated costs to perform the Work and reimbursement of EPA Future Response Costs of $1,000,000 into the RD/RA Trust Fund. Exactly one year after the SDs' initial payment, the SDs shall make a second payment towards the estimated costs to perform the Work and reimbursement of EPA Future Response Costs of $1,075,830.54 to the RD/RA Trust Fund.

38.     Money paid into the RD/RA Trust Fund by SDs as provided in Section XI (Trust Fund; Additional Payments), and by SFAs as provided in Paragraph 32.b. (Payments to RD/RA Trust Fund) and Section XI (Trust Fund; Additional Payments), shall be used solely to pay for the Work performed by SDs pursuant to this CD, including expenses (a) of administering the RD/RA Trust Fund, (b) to retain a third-party contractor to be identified as the generator of wastes, and (c) for reimbursement of Future Response Costs. The RD/RA Trust Fund may not be used to pay stipulated penalties that may be required to be paid pursuant to Section XV (Stipulated Penalties), indemnification that may be required to be paid pursuant to Section XII (Indemnification and Insurance) and shall not be used to pay attorneys' fees or other litigation costs of SDs, except as to the extent that such fees and costs are recoverable response costs under Key Tronic Corp. v. United States, 511 U.S. 809 (1994), and other applicable authorities.

39.     Notwithstanding the terms of the RD/RA Trust Agreement, SDs shall be jointly and severally liable for compliance with this CD. SDs shall provide EPA with written notice at least 10 days in advance of any proposed change in the RD/RA Trust Agreement or of the trustee, and shall secure EPA's approval of any such revisions. EPA has the authority to remove any trustee based on evidence of fraud, misrepresentation, bad faith or failure to reasonably

exercise its fiduciary duties in connection with the administration of the RD/RA Trust Fund. Within 5 business days of receipt by SDs of written notice from EPA (i) stating that there is evidence with respect to the trustee of fraud, misrepresentation, bad faith, or failure to reasonably exercise its fiduciary duties in connection with the administration of the RD/RA Trust Fund, and (ii) requesting the trustee's removal, SDs shall exercise their rights under Paragraph 14.b. of the RD/RA Trust Agreement and deliver written notice to the trustee to effect the trustee's removal in accordance with the terms of the RD/RA Trust Agreement. EPA, through its acceptance of the terms and conditions of the RD/RA Trust Agreement or otherwise, does not guarantee the monetary sufficiency of the RD/RA Trust Fund for its purposes, nor the legal sufficiency of the RD/RA Trust Agreement.

40.     The RD/RA Trust Agreement shall provide that the trustee shall, within 60 days after its appointment and every 90 days thereafter, submit to SDs, SFAs, and EPA financial reports ("Trustee's Report") that include: (a) the amount of money currently in the RD/RA Trust Fund, including the income on Permitted Investments (as that term is defined in the approved RD/RA Trust Agreement), at the end of the period covered by the report; (b) cash flow projections showing the amount of funds that will be necessary to pay for the obligations of SDs to perform the Work under this CD, including reimbursement of Future Response Costs, for at least the next 36 months; and (c) the estimated amount of money needed for SDs to complete the Work under this CD, including reimbursement of Future Response Costs. The Project Coordinator designated in accordance with Paragraph 9.a. of this CD, within 30 days after the trustee's appointment, and every 90 days thereafter, shall submit to the trustee, SFAs, and EPA a report that provides the necessary cash flow projections.

41.     If the amount of money in the RD/RA Trust Fund, including all income earned on Permitted Investments, as that term is defined in the approved RD/RA Trust Agreement, is less than the sum of the amount projected in the Trustee's Report to be needed to perform the Work, including reimbursement of Future Response Costs, for the next 36 months, the trustee shall prepare a proposed request for additional contributions to the RD/RA Trust Fund ("Additional Funding Request"). The trustee shall submit the proposed Additional Funding Request to SDs, SFAs, and EPA for review. The proposed Additional Funding Request shall indicate the specific amounts to be requested from SFAs and SDs, and shall include: (1) a summary of expenditures made from the RD/RA Trust Fund to date that is sufficiently detailed to demonstrate whether or not the expenditures have been made in accordance with the requirements of Paragraph 38 herein; (2) a summary of the contributions made by SDs and SFAs and the income earned on Permitted Investments; and (3) the estimated amount of money needed for SDs' performance of the Work under this CD, including reimbursement of Future Response Costs, for the next 36 months. The proposed Additional Funding Request presented to the SFAs shall be in the amount of 98% of the difference between the amount of money then present in the RD/RA Trust Fund and the amount of money needed for SDs performance of the Work, including reimbursement of Future Response Costs, for the next 36 months. The proposed Additional Funding Request presented to SDs shall be in the amount of 2% of the difference between the amount of money then present in the RD/RA Trust Fund and the amount of money needed for SDs performance of the Work, including reimbursement of Future Response Costs, for the next 36 months. In addition, in calculating the proposed Additional Funding Request, the trustee shall provide SDs and SFAs with an appropriate credit for: (1) all income on Permitted Investments as of the date of the proposed Additional Funding Request; and (2) the estimated future income on Permitted

20

Investments as of the date of the proposed Additional Funding Request until the conclusion of the next 36 months (based on the then-current rate of return on U.S. Government securities selected pursuant to the Trust Agreement).

42.     Within 7 days of issuance of any proposed Additional Funding Request, SDs' Project Coordinator shall submit to SFAs and EPA a report ("Certified Summary Report") detailing and itemizing: (1) the estimated costs for performance of the Work as of the Effective Date; (2) the Work performed as of the date of the proposed Additional Funding Request; (3) the actual costs incurred and paid for the performance of the Work, as of the date of the proposed Additional Funding Request; and (4) the basis for the proposed Additional Funding Request. Each Certified Summary Report shall include the following certification signed by a principal of the Project Coordinator's firm, other than the Project Coordinator:

> To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I further certify that in my professional judgment the actual costs summarized in this submission were incurred and paid for necessary Work in compliance with the requirements of the CD, the SOW, and EPA-approved deliverables. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

43.     The amount of the Additional Funding Request provided by the trustee pursuant to Paragraph 41 shall be subject to EPA approval (SDs and SFAs may provide comments to EPA concerning the Additional Funding Request within 15 days after receipt). Within 5 days after receipt of EPA approval of such Additional Funding Request, the trustee shall present the Additional Funding Request to SDs and SFAs for payment, with a copy to EPA.

44.     SDs shall, within 60 days after receipt of any trustee's request for payment of an Additional Funding Request, deposit the amount requested from SDs into the RD/RA Trust Fund.

45.

    a.     Upon receipt of any trustee's request for payment of an Additional Funding Request, SFAs shall have 30 days to present to SDs, with a copy to EPA, any objections they have to the Additional Funding Request. Any such objections shall be limited to the following issues: (1) whether expenditures from the RD/RA Trust Fund were made in accordance with the requirements of Paragraph 38 herein; (2) whether proper credit was given for SFAs' initial payments and income earned thereon; (3) whether there has been any fraud, misrepresentation or bad faith in the administration of the RD/RA Trust Fund or in the conduct of the Work by SDs; (4) whether the Additional Funding Request or supporting documents contain an accounting error; and (5) whether SFAs require any additional information or backup documentation to assess any of these issues. If no such objections to the Additional Funding Request are presented by SFAs, then, the United States, on behalf of SFAs, shall deposit the amount requested into the RD/RA Trust Fund as soon as reasonably practicable after receipt of the Additional Funding Request, in accordance with the procedures described in Paragraph 32.b. (Payments to RD/RA Trust Fund) and Section XI (Trust Fund; Additional Payments) herein. In

21

the event the payments required by this Paragraph are not made within 60 days after receipt of any Additional Funding Request, Interest on such payments shall be paid at the rate established pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), commencing on the date of receipt of the trustee's request for payment of the Additional Funding Request and accruing through the date of the payment.

        b.    In the event that the RD/RA Trust Fund suffers any losses due to actions of the trustee, SDs shall attempt to recover such losses from the trustee pursuant to remedies available under the RD/RA Trust Agreement in the first instance, but thereafter, the Parties agree that the sole mechanism for recouping any remaining losses to the RD/RA Trust Fund shall, to the extent necessary to fund remaining Work under this CD, be through an Additional Funding Request. No objection to such an Additional Funding Request may be based on allegations that SDs were negligent in their selection of the trustee, provided that the selected trustee was approved by EPA pursuant to Paragraphs 37 or 39 of this CD.

      46.    If SFAs present objections to an Additional Funding Request, as described in the preceding Paragraph, then SDs and SFAs shall attempt informally to resolve the dispute within 21 days from the date the objections are presented to SDs ("Informal Resolution Period"). SDs shall make their Project Coordinator available to meet with the Parties and/or to provide information relevant to such negotiations upon request. If the dispute cannot be resolved within the 21-day Informal Resolution Period, then SFAs shall have the right to reduce any portion of the Additional Funding Request to the extent that SFAs can establish that expenditures were not made in accordance with the requirements of Paragraph 38 herein, that there is insufficient documentation to show whether or not expenditures were made in accordance with the requirements of Paragraph 38 herein, there is an accounting error, or that there was fraud, misrepresentation, or bad faith in the performance of the Work performed to date. Fraud, misrepresentation, or bad faith may be established by a showing that a specific expenditure was so excessive and outside ordinary market prices and practices that it overcomes the presumption of good faith in the performance of work being overseen by EPA. Mere inefficiency in performance of the Work or mere failure to obtain a competitive or market price shall not by itself be sufficient to establish fraud, misrepresentation or bad faith. The collective amount of any such challenged expenditures shall be referred to as the "Objection Amount." As soon as reasonably practicable after the conclusion of the Informal Resolution Period, the United States, on behalf of SFAs, shall, deposit the uncontested portion of the Additional Funding Request (i.e., the total amount of the Additional Funding Request minus the Objection Amount) into the RD/RA Trust Fund, in accordance with the procedures described in Paragraph 32.b. (Payments to RD/RA Trust Fund) and Section XI (Trust Fund; Additional Payments). No Interest shall accrue on SFAs' Objection Amount.

      47.    Within 90 days of EPA's issuance of Certificate of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW, unless the parties agree to a different time period, SDs shall send notice for EPA approval for any money remaining in the RD/RA Trust Fund that is attributable to SDs' contributions to the RD/RA Trust Fund (including income of Permitted Investments on such amount), to be returned to SDs in accordance with the RD/RA Trust Agreement, and for any money remaining in the RD/RA Trust Fund that is attributable to contributions by SFAs (including income on Permitted Investments on such amount) to be transferred to the United States Treasury in accordance with the RD/RA Trust Agreement.

48.     If either SD fails to make timely payments into the RD/RA Trust Fund of the amounts required of the SD under Paragraphs 31 (Payments by SDs for Future Response Costs) 37, and 44, within 45 days after such SD fails to make such timely payments, the other SD shall pay the unpaid amount due from the SD that has not submitted its payment.  The failure of either SD to pay for its share of the necessary expenses of SDs under this CD, shall not excuse timely completion of any obligation under this CD (except as provided in Section XIII (Force Majeure) regarding the failure of SFAs to make payments to the RD/RA Trust Fund in accordance with Section XI (Trust Fund; Additional Payments) and Paragraph 32.b. (Payments to RD/RA Trust Fund), and shall subject only the non-paying SD to stipulated penalties hereunder, provided the other SD makes the payments required pursuant to this Paragraph.

## XII.   INDEMNIFICATION AND INSURANCE

### 49.   SDs' Indemnification of the United States.

a.     The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs incurred by the United States including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SDs nor any such contractor shall be considered an agent of the United States.

b.     The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 49, and shall consult with SDs prior to settling such claim.

50.     SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

23

51.    **Insurance.** No later than 15 days before commencing any on-site Work, SDs shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 4.6 (Certification of RA Completion) of the SOW, commercial general liability insurance with limits of $1 million, for any one occurrence, and automobile liability insurance with limits of $1 million, combined single limit, and umbrella liability insurance with limits of liability of $10 million, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to EPA certificates of such insurance and upon request a copy of each insurance policy. SDs shall resubmit such certificates and upon request copies of policies each year on the anniversary of the Effective Date. If SDs demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XIII. FORCE MAJEURE

52.    "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards. Notwithstanding the foregoing, excusable delay under the provisions of this Paragraph for SDs' failure to comply with any interim or final time deadline required under this CD shall exist due to the failure of SFAs to make payments to the RD/RA Trust Fund in accordance with Section XI (Trust Fund; Additional Payment) and Paragraph 32.b. (Payments to RD/RA Trust Fund), but only for the period of time by which the federal payment is delayed. Under no circumstances can SDs be required to perform any work under this CD for which funds are not available in the RD/RA Trust Fund, provided that SDs have paid into the RD/RA Trust Fund all funding requests required of them under this CD.

53.    If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Office of Site Remediation and Restoration, EPA Region 1, within 24 hours of when SDs first knew that the event might cause a delay. Within 5 days thereafter, SDs shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the

24

delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SDs, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 52 and whether SDs have exercised their best efforts under ¶ 52, EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

54.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SDs in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

55.    If SDs elect to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SDs shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 52 and 53. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to EPA and the Court.

56.    The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the SOW, SDs may seek relief under this Section.

## XIV.  DISPUTE RESOLUTION

57.    Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

58.    A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal

negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

59.     **Statements of Position.**

a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 7 days after the conclusion of the informal negotiation period, SDs invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SDs. The Statement of Position shall specify SDs' position as to whether formal dispute resolution should proceed under ¶ 60 (Record Review) or ¶ 61.

b.      Within 14 days after receipt of SDs' Statement of Position, EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 60 (Record Review) or ¶ 61. Within 14 days after receipt of EPA's Statement of Position, SDs may submit a Reply.

c.      If there is disagreement between EPA and SDs as to whether dispute resolution should proceed under ¶ 60 (Record Review) or ¶ 61, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SDs ultimately appeal to the Court to resolve the dispute, the Court shall determine which ¶ is applicable in accordance with the standards of applicability set forth in ¶¶ 60 and 61.

60.     **Record Review.** Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the ROD's provisions.

a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.      The Director of the Office of Site Remediation and Restoration, EPA Region 1, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 60.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 60.c. and 60.d.

c.      Any administrative decision made by EPA pursuant to ¶ 60.b. shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by

26

SDs with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

        d.    In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Office of Site Remediation and Restoration Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 60.a.

    61.    Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

        a.    The Director of the Office of Site Restoration and Remediation, EPA Region 1, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 59. The Office of Site Remediation and Restoration Director's decision shall be binding on SDs unless, within 10 days after receipt of the decision, SDs file ' with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

        b.    Notwithstanding ¶ N (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

    62.    The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as provided in ¶ 35 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 69. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SDs do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XV (Stipulated Penalties).

## XV.   STIPULATED PENALTIES

    63.    SDs shall be liable for stipulated penalties in the amounts set forth in ¶¶ 64 and 65 to EPA for failure to comply with the requirements of this CD specified below, unless excused under Section XIII (Force Majeure). "Compliance" by SDs shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

64.     Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables).

      a.     The following stipulated penalties shall accrue per violation per day for any noncompliance except those identified in ¶ 65:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $2,500 |
| 15th through 30th day | $3,750 |
| 31st day and beyond | $7,500 |

65.     **Stipulated Penalty Amounts - Deliverables.**

      a.     **Material Defects.** If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 63. The provisions of Section XIV (Dispute Resolution) and Section XV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding SDs' submissions under this CD.

      b.     The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $750 |
| 15th through 30th day | $1,250 |
| 31st day and beyond | $2,500 |

66.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 81 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount of $1,000,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 29 (Access to Financial Assurance) and 81 (Work Takeover).

67.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SDs of any deficiency; (b) with respect to a decision by the Director of the Office of Site Remediation and Restoration, EPA Region 1, under ¶ 60.b. or ¶ 61.a. of Section XIV (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SDs' reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIV (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

28

68.    Following EPA's determination that SDs have failed to comply with a requirement of this CD, EPA may give SDs written notification of the same and describe the noncompliance. EPA may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SDs of a violation.

69.    All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIV (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 34.b. (instructions for future response cost payments).

70.    Penalties shall continue to accrue as provided in ¶ 67 during any dispute resolution period, but need not be paid until the following:

a.    If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

b.    If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 70.c.;

c.    If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SDs to the extent that they prevail.

71.    If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 69 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 69 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

72.    The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

73.    Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to

Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

74.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XVI.  COVENANTS BY PLAINTIFF

75.    **Covenants for SDs by United States.**

Except as provided in ¶¶ 77, 78 (United States' Pre- and Post-Certification Reservations), and 80 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs pursuant to Sections 106 and 107(a) of CERCLA relating to the Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Certification of RA Completion by EPA pursuant to ¶ 4.6 (Certification of RA Completion) of the SOW. These covenants are conditioned upon the satisfactory performance by SDs of their obligations under this CD. These covenants extend only to SDs and do not extend to any other person.

76.    **Covenant for SFAs.**

Except as provided in ¶¶ 77, 78 (United States' Pre- and Post-Certification Reservations), and 80 (General Reservations of Rights), EPA covenants not to take administrative action against SFAs pursuant to Sections 106 and 107(a) of CERCLA relating to the Site. Except with respect to future liability, EPA's covenant shall take effect upon the Effective Date. With respect to future liability, EPA's covenant shall take effect upon Certification of RA Completion by EPA pursuant to ¶ 4.6 (Certification of RA Completion) of the SOW. EPA's covenant is conditioned upon the satisfactory performance by SFAs of their obligations under this CD. EPA's covenant extends only to SFAs and does not extend to any other person.

77.    **United States' Pre-Certification Reservations.** Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs, and EPA reserves the right to issue an administrative order seeking to compel SFAs, to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

78.    **United States' Post-Certification Reservations.** Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs, and EPA reserves the right to issue an administrative order seeking to compel SFAs, to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information,

30

previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

79.     For purposes of ¶ 77 (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date the ROD was signed and set forth in the ROD for the Site and the administrative record supporting the ROD. For purposes of ¶ 78 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of RA Completion and set forth in the ROD, the administrative record supporting the ROD, the post-ROD administrative record, or in any information received by EPA pursuant to the requirements of this CD prior to Certification of RA Completion.

80.     **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SDs with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs, and EPA reserves, and this CD is without prejudice to, all rights against SFAs, with respect to:

a.     liability for failure by SDs or SFAs to meet a requirement of this CD;

b.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.     liability based on the ownership of the Site by SDs or SFAs when such ownership commences after signature of this CD by SDs or SFAs;

d.     liability based on the operation of the Site by SDs when such operation commences after signature of this CD by SDs and does not arise solely from SDs' performance of the Work and liability based on the operation of the Site by SFAs when such operation commences after signature of this CD by SFAs;

e.     liability based on SDs' or SFAs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SDs or SFAs;

f.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.     criminal liability;

h.     liability for violations of federal or state law that occur during or after implementation of the Work; and

i.     liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 14 (Modification of SOW or Related Deliverables).

31

81.     **Work Takeover**.

        a.     In the event EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of 10 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

        b.     If, after expiration of the 10-day notice period specified in ¶ 81.a., SDs have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SDs in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 81.b. Funding of Work Takeover costs is addressed under ¶ 29 (Access to Financial Assurance).

        c.     SDs may invoke the procedures set forth in ¶ 60 (Record Review) to dispute EPA's implementation of a Work Takeover under ¶ 81.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 81.b. until the earlier of (1) the date that SDs remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 60 (Record Review) requiring EPA to terminate such Work Takeover.

82.     Notwithstanding any other provision of this CD, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XVII. COVENANTS BY SDs AND SFAs

83.     **Covenants by SDs**. Subject to the reservations in ¶ 92, SDs covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Site, and this CD, including, but not limited to:

        a.     any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

        b.     any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Site, Past Response Costs, Future Response Costs, and this CD; or

        c.     any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Commonwealth of Massachusetts Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

84.     The covenants set forth in Paragraph 83 do not pertain to any matters other than those expressly identified therein. SDs reserve, and this CD is without prejudice to, all rights against SFAs with respect to all other matters, including but not limited to any claims arising from the off-site disposal or on-site reuse of materials used and/or wastes generated during the Work.

85.     EPA and SFAs agree that SDs have not and do not admit to any future generator liability arising from or in connection with the handling, processing and off-site disposal or on-site reuse of materials used and/or waste generated during the Work.

86.     Specifically with respect to off-site disposal of Waste Material, SDs do not concede that they have or will have liability relating to off-site disposal.

87.     **Covenant by SFAs.** SFAs agree not to assert any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112, or 113, or any other provision of law with respect to the Site and this CD. This covenant does not preclude demand for reimbursement from the Superfund of costs incurred by a SFA in the performance of its duties (other than pursuant to this CD) as lead or support agency under the NCP.

88.     The covenants set forth in Paragraph 87 do not pertain to any matters other than those expressly identified therein. SFAs reserve, and this CD is without prejudice to, all rights against SDs with respect to all other matters, including but not limited to any claims arising from the off-site disposal or on-site reuse of materials used and/or wastes generated during the Work.

89.     EPA and SDs agree that SFAs have not and do not admit to any future generator liability arising from or in connection with the handling, processing and off-site disposal or on-site reuse of materials used and/or waste generated during the Work.

90.     Specifically with respect to off-site disposal of Waste Material, SFAs do not concede that they have or will have liability relating to off-site disposal.

91.     Except as provided in ¶¶ 95 (Waiver of Claims by SDs) and 101 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XVI (Covenants by Plaintiff), other than in ¶¶ 80.a. (claims for failure to meet a requirement of the CD), 80.g. (criminal liability), and 80.h. (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

92.     SDs reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on

EPA's selection of response actions, or the oversight or approval of SDs' deliverables or activities. SDs also reserve, and this CD is without prejudice to, contribution claims against SFAs in the event any claim is asserted by the United States against SDs pursuant to any of the reservations in Section XVI (Covenants by Plaintiff) other than in ¶¶ 80.a. (claims for failure to meet a requirement of the CD), 80.g. (criminal liability), and 80.h. (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

93.    Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

94.    SDs agree not to seek to recover any costs they have incurred or will incur in connection with the Work, Past Response Costs, and Future Response Costs and this CD through government contracts. Nothing in this CD shall constitute an acknowledgement or agreement by the United States and SDs that SDs have any right to recover costs incurred or to be incurred in connection with the Work, Past Response Costs, and Future Response Costs and this CD pursuant to any government contract.

95.    **Waiver of Claims by SDs.**  SDs agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for all matters relating to the Site against any person where the person's liability to SDs with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

## XVIII.    EFFECT OF SETTLEMENT; CONTRIBUTION

96.    Except as provided in ¶ 95 (Waiver of Claims by SDs), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVII (Covenants by SDs and SFAs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

97.    The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD and each SFA has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be

34

otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person; provided, however, that if the United States exercises rights against SDs (or if EPA or the federal natural resource trustee assert rights against SFAs) under the reservations in Section XVI (Covenants by Plaintiff), other than in ¶¶ 80.a. (claims for failure to meet a requirement of the CD), 80.g. (criminal liability), or 80.h. (violations of federal/state law during or after implementation of the Work), the "matters addressed" in this CD will no longer include those response costs or response actions that are within the scope of the exercised reservation.

98.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each SD and each SFA has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

99.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

100.    Each SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on such SD. In addition, each SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

101.    **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVI (Covenants by Plaintiff).

102.    Nothing in this CD shall be construed as an indication that the Parties hereto have agreed to an allocation as between themselves, either under CERCLA Section 113, 42 U.S.C. § 9613, or otherwise, of any costs incurred or to be incurred in connection with the Site other than costs relating to the Work, Past Response Costs, and Future Response Costs. Each Party expressly acknowledges that the commitments undertaken pursuant to this CD are without prejudice to any position that any Party may take in the course of further litigation or discussions regarding contribution for costs other than costs for the Work, Past Response Costs, and Future Response Costs required by this CD, and without admission that any particular allocation is appropriate.

35

# XIX.  ACCESS TO INFORMATION

103.    SDs shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.  Upon request, SDs shall provide and make available to the SFAs the same information and personnel that SDs provide and make available to EPA.

104.    **Privileged and Protected Claims.**

a.      SDs may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the Record, provided SDs comply with ¶ 104.b., and except as provided in ¶ 104.c.

b.      If SDs assert a claim of privilege or protection, they shall provide Plaintiff with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.      SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

105.    **Business Confidential Claims.** SDs may assert that all or part of a Record provided to Plaintiff under this Section or Section XX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SDs shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SDs assert business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified SDs that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SDs.

106.    If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

107.    Notwithstanding any provision of this CD, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.    RETENTION OF RECORDS

108.    Until 10 years after EPA's Certification of Work Completion under ¶ 4.8 (Certification of Work Completion) of the SOW, each SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SDs who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

109.    The United States acknowledges that each SFA (a) is subject to all applicable federal record retention laws, regulations, and policies; and (b) has certified that it has fully complied with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

110.    At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, and except as provided in ¶ 104 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA.

111.    Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States and that it has fully complied with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XXI.    NOTICES AND SUBMISSIONS

112.    All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless

otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

| | |
|---|---|
| **As to the United States:** | EES Case Management Unit<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>eescdcopy.enrd@usdoj.gov<br>Re: DJ # 90-11-2-07237/12 |
| **and:** | Chief<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>Environmental Defense Section<br>Washington, D.C. 20044-7611<br>Re: DJ # 90-11-2-07237/12 |
| **As to the SFAs:** | Peter Flynn<br>Senior Attorney<br>U.S. Department of Justice<br>Environment and Natural Resources Division<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br><br>Chief, Litigation Branch<br>Environmental Law Division<br>U.S. Army Legal Services Agency<br>9275 Gunston Road, Suite 4300<br>Fort Belvoir, VA 22060 |
| **As to EPA:** | Director, Office of Site Remediation and Restoration<br>U.S. Environmental Protection Agency<br>Region 1<br>5 Post Office Square, Suite 100, Mailcode: OSRR07-5<br>Boston, MA 02109 |

**and:**

Christopher Smith
EPA Remedial Project Manager
U.S. Environmental Protection Agency
Region 1
5 Post Office Square, Suite 100, Mailcode: OSRR07-1
Boston, MA 02109
smith.christopher@epa.gov
617-918-1339

**As to the Regional Financial
Management Officer:**

Shannon Schofield
U.S. Environmental Protection Agency
Region 1
5 Post Office Square, Suite 100 (OARM05-6)
Boston, MA 02109-3912
schofield.shannon@epa.gov

**At to EPA Cincinnati Finance
Center:**

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

**As to the State:**

Garry Waldeck
State Project Coordinator
MassDEP-BWSC
1 Winter Street
Boston, MA 02108
garry.waldeck@state.ma.us

**As to SDs:**
                         Eric G. Lardiere, Esq.
President and Secretary
Whittaker Corporation
1955 N. Surveyor Avenue
Simi Valley, CA 93063-3386
eric.lardiere@meggitt.com
805-526-5700 x6650

Gary L. Gill-Austern, Esq.
Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
Boston, MA 02210-2604
ggill-austern@nutter.com
617 439-2250

Jamieson M. Schiff, Esq.
Senior Environmental Health and Safety Counsel
Textron Inc.
40 Westminster Street
Providence, RI 02903
jschiff@textron.com
401-457-2422

Bruce R. Thompson
Project Coordinator
*de maximis, inc.*
200 Day Hill Road, Suite 200
Windsor, CT 06095
brucet@demaximis.com
860-298-0541

## XXII. RETENTION OF JURISDICTION

113.    This Court retains jurisdiction over both the subject matter of this CD and SDs for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIV (Dispute Resolution).

## XXIII.     APPENDICES

114.    The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the SOW.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the draft form of the NAUL.

"Appendix E" is the draft RD/RA Trust Agreement.

## XXIV.    MODIFICATION

115.    Except as provided in ¶ 14 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 14, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SDs. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

116.    Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

117.    This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SDs consent to the entry of this CD without further notice.

118.    If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXVI.    SIGNATORIES/SERVICE

119.    Each undersigned representative of a SD to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

120.    Each SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs in writing that it no longer supports entry of the CD.

121.    Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of

that Party with respect to all matters arising under or relating to this CD. SDs agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

### XXVII.    FINAL JUDGMENT

122.    This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

123.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 6th DAY OF December, 20 19.

United States District Judge

42

Signature Page for CD regarding the NMI Superfund Site

FOR THE UNITED STATES OF AMERICA:

5/9/19
Dated

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

10/9/19
Dated

CATHERINE ADAMS FISKE
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
408 Atlantic Avenue – Suite 236
Boston, MA 02110
(617) 748-3399; Addie.fiske@usdoj.gov

ANDREW E. LELLING
United States Attorney
District of Massachusetts

SUSAN POSWISTILO
Assistant United States Attorney
John J. Moakley U.S. Courthouse, Suite 9200
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

43

Signature Page for CD regarding the NMI Superfund Site

4/20/18
Dated

BRYAN OLSON
Director, Office of Site Remediation and Restoration
U.S. Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MA 02109

4/20/2018
Dated

SARAH MEEKS
Enforcement Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MA 02109

44

Signature Page for CD regarding the NMI Superfund Site

OK *[initials]*
4/11/18

**FOR TEXTRON, INC.:**

4/11/18
**Dated**

_____
Lawrence La Sala
**Vice President and Deputy General Counsel-Litigation**
**Textron Inc.**
**40 Westminster St.**
**Providence, RI 02903**

**Agent Authorized to Accept Service**     Name (print):  Jamieson Schiff
**on Behalf of Above-signed Party:**         Title:              Executive Counsel
                                                              Company:      Textron Inc.
                                                              Address:       40 Westminster St.
                                                                                     Providence, RI 02903
                                                              Phone:          401-457-2422
                                                              email:            jschiff@textron.com

45

Signature Page for CD regarding the NMI Superfund Site

**FOR WHITTAKER CORPORATION:**

April 5, 2018
Dated

Eric G. Lardiere
President and Secretary
Whittaker Corporation
1955 N. Surveyor Avenue
Simi Valley, CA 93063-3386

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): ERIC G. LARDIERE
Title: PRESIDENT & SECRETARY
Company: WHITTAKER CORPORATION
Address: 1955 N. SURVEYOR AVENUE
Simi VALLEY, CA 93063-3386
Phone: 805-526-5700, x 6650
email: eric.lardiere @ meggitt.com

46